UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>　*Plaintiff*,<br><br>　v.<br><br>RYAN COHEN<br><br>　*Defendant*. | Civil Action No. |

COMPETITIVE IMPACT STATEMENT

The United States of America ("United States"), under Section 2(b) of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) ("APPA" or "Tunney Act"), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

**I.    NATURE AND PURPOSE OF THE PROCEEDING**

On September 18, 2024, the United States filed a Complaint against Defendant Ryan Cohen ("Cohen" or "Defendant"), relating to Cohen's acquisitions of voting securities of Wells Fargo & Company ("WF") from March 2018 through September 2020. The Complaint alleges that Cohen violated Section 7A of the Clayton Act, 15 U.S.C. § 18a, commonly known as the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act"). The HSR Act requires certain acquiring persons and certain persons whose voting securities or assets are acquired to file notifications with the Department of Justice and the Federal Trade Commission (collectively, the "federal antitrust agencies") and to observe a waiting period before consummating certain acquisitions of voting securities or assets. 15 U.S.C. § 18a (a) and (b).

These notification and waiting period requirements apply to acquisitions that meet the HSR Act's size of transaction and size of person thresholds, which have been adjusted annually since 2004. The size of transaction threshold is met for transactions valued over $50 million, as adjusted ($84.4 million in 2018). In addition, there is a separate filing requirement for transactions in which the acquirer will hold voting securities in excess of $100 million, as adjusted ($168.8 million in 2018).

With respect to the size of person thresholds, the HSR Act requires one person involved in the transaction to have sales or assets in excess of $10 million, as adjusted ($16.9 million in 2018), and the other person to have sales or assets in excess of $100 million, as adjusted ($168.8 million in 2018). A key purpose of the notification and waiting period requirements is to protect consumers and competition from potentially anticompetitive transactions by providing the federal antitrust agencies an opportunity to conduct an antitrust review of proposed transactions before they are consummated.

An exemption from HSR Act filings may apply under certain circumstances. Section (c)(9) of the HSR Act, 15 U.S.C. § 18a(c)(9), exempts from the requirements of the HSR Act acquisitions of voting securities "solely for the purpose of investment" if, as a result of the acquisition, the securities held do not exceed 10 percent of the outstanding voting securities of the issuer.  Section 801.1(i)(1) of the HSR Rules, 16 C.F.R. § 801.1(i)(1), defines the term "solely for the purpose of investment" as follows:

> Voting securities are held or acquired "solely for the purpose of investment" if the person holding or acquiring such voting securities has no intention of participating in the formulation, determination, or direction of the basic business decisions of the issuer ("Investment-Only Exemption").

The Complaint alleges that Cohen acquired voting securities of WF without filing the required pre-acquisition HSR Act notifications with the federal antitrust agencies and without observing the waiting period. Cohen's acquisitions of WF voting securities exceeded the $100-million statutory threshold, as adjusted, and Cohen and WF met the then-applicable adjusted statutory size of person thresholds. Moreover, none of Cohen's acquisitions were exempt from HSR Act notification and waiting period requirements under the Investment-Only Exemption.

At the same time the Complaint was filed in the present action, the United States also filed a Stipulation and Order and proposed Final Judgment that resolve the allegations made in the Complaint. The proposed Final Judgment is designed to address the violation alleged in the Complaint and penalize Cohen's HSR Act violations. Under the proposed Final Judgment, Cohen must pay a civil penalty to the United States in the amount of $985,320.

The United States and Cohen have stipulated that the proposed Final Judgment may be entered after compliance with the APPA, unless the United States first withdraws its consent. Entry of the proposed Final Judgment will terminate this action, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and punish violations thereof.

## II.     DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

The crux of Cohen's violation is that he failed to submit HSR Act notifications even though his acquisitions of WF voting securities satisfied the HSR Act filing requirements and he was not eligible to take advantage of the Investment-Only Exemption. At all times relevant to the Complaint, Cohen had sales or assets in excess of $10 million, as adjusted. At all times relevant to the Complaint, WF had sales or assets in excess of $100 million, as adjusted.

Cohen is an entrepreneur and the managing partner of RC Ventures, LLC, a venture capital fund. Cohen previously founded the e-commerce company Chewy, Inc., in 2011, and was its CEO until 2018. Cohen is now the Chairman of GameStop Corp.

Beginning in June 2016, Cohen made periodic acquisitions of WF voting securities. On February 5, 2018, Cohen emailed WF's CEO to suggest improvements to WF's business operations and to advocate for a board seat. On March 22, 2018, Cohen acquired 562,077 WF voting securities via the open market, which resulted in his aggregated holdings to exceed the $100 million threshold, as adjusted, which in March 2018, was $168.8 million.

Cohen's March 22, 2018, acquisitions of WF voting securities were not exempt under the Investment-Only Exemption. Cohen's intent when he made the March 22, 2018, acquisitions of WF voting securities was to participate "in the formulation, determination, or direction of the basic business decisions" of WF as evidenced by Cohen's email on February 5, 2018, when he advocated for a board seat. Although required to do so, Cohen did not file under the HSR Act or observe the HSR Act's waiting period prior to completing the March 22, 2018, transaction. Cohen proceeded to have periodic communications with WF's leadership regarding suggestions to improve WF's business and to advocate for a potential board seat through at least April 2020.

From March 22, 2018, through September 2, 2020, Cohen continued to acquire WF voting securities through open market purchases, and in twenty instances those acquisitions exceeded 100,000 shares. For example, Cohen acquired 350,000 voting securities on August 14, 2019; 354,131 voting securities on March 10, 2020; 366,316 voting securities on July 20, 2020; and 500,000 voting securities on August 5, 2020. All of these acquisitions were made on the open market. Open market acquisitions require an acquirer to affirmatively and actively decide to

acquire voting securities; in particular for very large open market acquisitions, it is not excusable negligence to be unaware of HSR Act legal requirements.

On January 14, 2021, Cohen made a corrective filing under the HSR Act for the acquisition he made on March 22, 2018, which resulted in Cohen's aggregated holdings of WF voting securities to exceed the $100 million threshold, as adjusted. Cohen was in continuous violation of the HSR Act from March 22, 2018, when he acquired the WF voting securities valued in excess of the HSR Act's $100 million filing threshold, as adjusted, through February 16, 2021, when the waiting period expired on his corrective filing.

### III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment imposes a $985,320 civil penalty designed to address the violation alleged in the Complaint, penalize the Defendant, and deter others from violating the HSR Act. The United States adjusted the penalty downward from the maximum permitted under the HSR Act because the violation was inadvertent and the Defendant is willing to resolve the matter by proposed final judgment and thereby avoid prolonged investigation and litigation. However, the penalty amount reflects that Defendant was seeking a board seat during the period in which he was making acquisitions of WF voting securities and could no longer rely on the Investment-Only Exemption. In addition, many of these acquisitions were large, open market acquisitions, such that he should have been aware of his obligations under the HSR Act. Open market acquisitions require an acquirer to affirmatively and actively decide to acquire voting securities; in particular for very large open market acquisitions, it is not excusable negligence to be unaware of HSR Act legal requirements. The penalty will not have any adverse effect on competition; instead, the relief should have a beneficial effect on competition because it will

deter the Defendant and others from failing to properly notify the federal antitrust agencies of future acquisitions, in accordance with the law.

## IV. REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

There is no private antitrust action for HSR Act violations; therefore, entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust action.

## V. PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and the Defendant have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within 60 days of the date of publication of this Competitive Impact Statement in the *Federal Register* or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States, which remains free to withdraw its consent to the proposed Final Judgment at any time before the Court's entry of the Final Judgment. The comments and the response of the United States will be filed with the Court. In addition, the comments and the United States' responses will be published in the *Federal Register* unless the Court agrees that the United States instead may publish them on the U.S. Department of Justice, Antitrust Division's internet website. Written comments should be submitted in English to:

>Maribeth Petrizzi
>Special Attorney, United States
>c/o Federal Trade Commission
>600 Pennsylvania Avenue, NW
>CC-8416
>Washington, D.C. 20580
>Email: bccompliance@ftc.gov

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against the Defendant. The United States is satisfied, however, that the proposed relief is an appropriate remedy in this matter. Given the facts of this case, including the Defendant's self-reporting of the violations and willingness to promptly settle this matter, the United States is satisfied that the proposed civil penalty is sufficient to address the violations alleged in the Complaint and to deter violations by similarly situated entities in the future, without the time, expense, and uncertainty of a full trial on the merits.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

Under the Clayton Act and APPA, proposed Final Judgments or "consent decrees" in antitrust cases brought by the United States are subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

>(A)   the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually

>
> considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a proposed Final Judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable").

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "make de novo determination of facts and issues." *United States v. W. Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*,

152 F. Supp. 2d 37, 40 (D.D.C. 2001); *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 16 (D.D.C. 2000); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General." *W. Elec. Co.*, 993 F.2d at 1577 (quotation marks omitted). "The court should bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is one that will *best* serve society, but only to confirm that the resulting settlement is within the *reaches* of the public interest." *Microsoft*, 56 F.3d at 1460 (quotation marks omitted); *see also United States v. Deutsche Telekom AG*, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020). More demanding requirements would "have enormous practical consequences for the government's ability to negotiate future settlements," contrary to congressional intent. *Microsoft*, 56 F.3d at 1456. "The Tunney Act was not intended to create a disincentive to the use of the consent decree." *Id.*

The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court. *See, e.g.*, *Microsoft*, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); *United States v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152-53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." (internal citations omitted)); *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d

9

1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case."). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461 (*quoting W. Elec. Co.*, 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged."). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459-60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76

(indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." *U.S. Airways*, 38 F. Supp. 3d at 76 (citing *Enova Corp.*, 107 F. Supp. 2d at 17).

## VIII. DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Date: September 18, 2024

Respectfully submitted,

/s/ Kenneth A. Libby
Kenneth A. Libby
Special Attorney
U.S. Department of Justice
Antitrust Division
c/o Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
Phone: (202) 326-2694
Email: klibby@ftc.gov